UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

Dennis E. Hecker

       Debtor.

---

| | |
|---|---|
| Randall L. Seaver, Trustee,<br><br>       Plaintiff,<br><br>vs.<br><br>New Buffalo Auto Sales, LLC, f/k/a Buffalo Chrysler, LLC, Maurice J. Wagener, and Palladium Holdings, LLC,<br><br>       Defendants. | Adv. File No. 10-5027-RJK<br>Bky. File No. 09-50779-RJK<br><br><br>**NOTICE OF HEARING AND MOTION FOR SUMMARY JUDGMENT** |

**TO: ALL ENTITIES SPECIFIED BY LOCAL RULE 9013-3.**

1.      Defendants New Buffalo Auto Sales, LLC ("NBAS") and Palladium Holdings, LLC ("Palladium") move the court for the relief requested below and give notice of hearing.

2.      The court will hold a hearing on this motion at 2:00 p.m. on January 19, 2011, in Courtroom No. 8 West, at the United States Courthouse, at 300 South Fourth Street, Minneapolis, Minnesota.

3.      Any response to this motion must be filed and served not later than January 14, 2011, which is 5 days before the time set for the hearing (including Saturdays, Sundays, and holidays). UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.

4.      This court has jurisdiction over this motion pursuant to 28 U.S.C. § 157 and 1334, Fed. R. Bankr. P. 5005 and Local Rule 1070-1. This proceeding is a core proceeding. The

petition commencing this chapter 7 case was filed on June 4, 2009. The case is now pending in this court.

     5.     This motion arises under Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56. This motion is filed under Fed. R. Bankr. P. 9014 and Local Rules 9006-1 and 9013. NBAS and Palladium seek summary judgment against Plaintiff.

     6.     This motion is based on the facts cited in the accompanying Memorandum of Law, as supported by the pleadings and affidavits cited and filed in this case.

Wherefore, NBAS and Palladium move the court for an order granting them summary judgment and dismissing all of the Trustee's claims, and such other relief as may be just and equitable.

DATED: December 22, 2010

**LINDQUIST & VENNUM** PLLP

By /s/ William P. Wassweiler

    William P. Wassweiler (#232348)
    wwassweiler@lindquist.com
    James M. Lockhart (#176746)
    jlockhart@lindquist.com
    Karla M. Vehrs (#0387086)
    kvehrs@lindquist.com
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)

**ATTORNEYS FOR NEW BUFFALO
AUTO SALES, LLC AND
PALLADIUM HOLDINGS, LLC**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Dennis E. Hecker

        Debtor.

| | |
|---|---|
| Randall L. Seaver, Trustee,<br><br>      Plaintiff,<br><br>vs.<br><br>New Buffalo Auto Sales, LLC, f/k/a Buffalo Chrysler, LLC, Maurice J. Wagener, and Palladium Holdings, LLC,<br><br>      Defendants. | Adv. File No. 10-5027-RJK<br>Bky. File No. 09-50779-RJK |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS NEW BUFFALO AUTO SALES, LLC AND PALLADIUM HOLDINGS, LLC

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

JURISDICTION .................................................................................................................1

FACTUAL BACKGROUND.................................................................................................1

    A.    The Northridge property and its encumbrances....................................................1

    B.    The judgments obtained against Hecker. ...............................................................2

    C.    U.S. Bank's foreclosure of its mortgage. ...............................................................3

    D.    The Trustee's Deed to Ralph Thomas.....................................................................3

    E.    Redemption from the U.S. Bank mortgage foreclosure. .......................................4

    F.    This adversary proceeding.......................................................................................5

ARGUMENT.....................................................................................................................6

I.       SUMMARY JUDGMENT STANDARD........................................................................6

II.     COUNTS I AND IV REGARDING THE PRE-PETITION JUDGMENTS
         OBTAINED AGAINST HECKER FAIL BECAUSE A JUDGMENT ALONE IS
         NOT A PREFERENCE. .............................................................................................7

III.    COUNT III FAILS BECAUSE THERE ARE NO FACTS TO SUPPORT THE
         TRUSTEE'S ALLEGATIONS. ....................................................................................8

IV.    COUNTS II AND V REGARDING THE POST-PETITION JUDGMENT LIENS
         AGAINST NORTHRIDGE FAIL.................................................................................9

    A.    The judgment liens were not filed against "property of the estate" because
          the Trustee had previously abandoned Northridge. ...............................................9

    B.    Even if Northridge had still been "property of the estate," the liens had no
          value, and there is nothing for the Trustee to recover under § 550. ....................12

    C.    The Trustee has no standing to bring claims against NBAS and Palladium
          under § 550 because any "value" in Northridge belonged to others, not to
          the estate. ................................................................................................................13

V.     COUNT VI REGARDING PALLADIUM'S JUNIOR-LIENHOLDER
         REDEMPTION BY WAY OF THE KOCH GROUP JUDGMENT IS MOOT. .............15

VI.    THE TRUSTEE MAY NOT CHALLENGE DEFENDANTS' REDEMPTIONS
         BECAUSE THE TRUSTEE'S CLAIMS ARE ONLY FASHIONED TO PUNISH
         NBAS AND PALLADIUM, NOT TO RESTORE THE ESTATE TO THE
         POSITION IT WOULD HAVE BEEN IN ABSENT THE "TRANSFERS." .................16

CONCLUSION.................................................................................................................17

# INTRODUCTION

With this adversary proceeding, Trustee Randall Seaver seeks to unwind a host of events since early 2009 surrounding the former residence of Debtor Dennis Hecker. In reality, however, the Trustee cannot escape the fact that he disclaimed and waived any interest in the property, known as Northridge, on two key occasions after this Chapter 7 case was commenced: once when the Trustee deeded Northridge to a friend of Hecker under a settlement agreement with approval from the Court; and again when the Trustee failed to redeem from the mortgage foreclosure of U.S. Bank, conducted with no opposition from the Trustee and upon receiving relief from the automatic stay. But even if the Trustee had retained some interest in Northridge, the events challenged in this action did not constitute "transfers" of estate property. Instead, the value in Northridge resulted from the failure of multiple junior lienholders to redeem *after* the Trustee's (arguable) period for redemption had already expired. Under established law, Defendants are accordingly entitled to entry of summary judgment.

# JURISDICTION

This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court has jurisdiction over the matter under 28 U.S.C. §§ 157 and 1334.

# FACTUAL BACKGROUND

**A.     The Northridge property and its encumbrances.**

At the time that this Chapter 7 petition was filed on June 4, 2009, Hecker owned and lived in a home located at 1615 Northridge Drive in Medina, Minnesota, legally described as Lot 15, Block 3, North Ridge Farm, Hennepin County ("Northridge").[1] Northridge had a "value in excess of $800,000."[2] Northridge is registered Torrens property.[3]

---

[1] 2d Am. Compl. ¶ 10.
[2] *Id.* ¶ 15.

As of June 2009, the value of the encumbrances on Northridge totaled approximately $3.7 million.  The property was commonly known to be "under water," or encumbered for far more than its market value.[4]  First, Northridge was encumbered by three mortgages:  a first mortgage to U.S. Bank in the original principal amount of $250,000; a second mortgage held by Mortgage Electronic Registration Systems, Inc. ("MERS") in the original principal amount of $650,000; and a third mortgage held by GMAC Mortgage Corporation in the original principal amount of $250,000.[5]  In addition, Northridge was encumbered by a federal tax lien in the amount of $2,612,791.87, filed against Hecker in the Hennepin County Recorder's Office in April 2009,[6] a mechanic's lien in the amount of $6,724.45, filed against the property on April 30, 2009, and a Hennepin County tax lien in the amount of $10,426.[7]  Upon evaluating the situation, the Trustee in fact concluded that "the amount of those liens far exceeded the value of the property."[8]

**B.     The judgments obtained against Hecker.**

In January 2009, NBAS and Wagener sued Hecker in Hennepin County District Court seeking a judgment for debt owed to them.[9]  The court in that action entered judgment in favor of

---

[3] *Id.* Ex. A.
[4] Case No. 09-50779, D.E. 181, 359.
[5] *Id.*
[6] Case No. 09-50779, D.E. 63 at 45.  IRS regulations provide that a tax lien on real property must be "filed in one office within the State (or the county or other governmental subdivision), as designated by the laws of the State, in which the property subject to the lien is deemed situated." 26 C.F.R. § 301.6323(f)-1.  Minnesota directs that "[n]otices of liens upon real property for obligations payable to the United States . . . shall be filed in the office of the county recorder of the county in which the real property subject to the liens is situated."  Minn. Stat. § 272.481(b). The same procedure applies to all real property in Minnesota regardless of whether the property is abstract or Torrens.  *Id.*; *see also* Minn. Stat. § 508.25(1).
[7] *Id.*; Case No. 09-50779, D.E. 181.
[8] Vehrs Decl. Ex. A at 6:14–6:19.
[9] 2d Am. Compl. ¶ 8.

NBAS and Wagener on May 7, 2009 in the amount of $324,938.72.[10] Because Northridge is Torrens property, the entry and docketing of the judgment did not create a lien on the property.[11]

In an unrelated action, an entity not party to this adversary proceeding, Koch Group Mpls, LLC, obtained a judgment against Hecker for $813.67 on April 29, 2009.[12] For the same reason as in the NBAS/Wagener judgment, this did not become a lien on Northridge.

Both the NBAS/Wagener judgment and the Koch Group judgment were obtained within 90 days before the filing of Hecker's bankruptcy petition.

### C. U.S. Bank's foreclosure of its mortgage.

On September 14, 2009, U.S. Bank filed a motion seeking relief from the automatic stay to foreclose its first mortgage on Northridge.[13] "[C]onsistent with [his] opinion that there wasn't value there for the estate," the Trustee did not file any response opposing the motion.[14] The Court granted U.S. Bank the relief sought on September 28, 2009.[15] A sheriff's sale of foreclosure was held on January 19, 2010.[16] U.S. Bank, as the foreclosing mortgagee, was the winning bidder at that sale with a bid of $213,263.00.[17] Pursuant to state foreclosure law, the mortgagor had until July 19, 2010 to redeem Northridge from the foreclosure.[18]

### D. The Trustee's Deed to Ralph Thomas.

Also in January 2010, the Trustee sought and received the Court's approval of a Settlement Agreement between himself, Hecker, Christi Rowan, and Ralph Thomas.[19] The

---

[10] *Id.* ¶ 9.
[11] Minn. Stat. § 508.63.
[12] 2d Am. Compl. ¶ 19.
[13] Case No. 09-50779, D.E. 181.
[14] Vehrs Decl. Ex. A at 7:11−7:18.
[15] Case No. 09-50779, D.E. 210.
[16] 2d Am. Compl. Ex. A.
[17] 2d Am. Compl. ¶ 13.
[18] Minn. Stat. § 580.23.
[19] Case No. 09-50779 D.E. 359, 372.

Trustee provided twenty days' notice to all creditors of Hecker prior to the hearing.[20]  The Settlement Agreement provided that Thomas had paid $75,000 in settlement funds to the Trustee, in exchange for which the Trustee would transfer to Thomas both a baby grand piano and title to Northridge.[21]  No creditors objected to the Settlement Agreement disposing of Northridge.  Accordingly, in February 2010, the Trustee signed and delivered a Trustee's Deed conveying Northridge to Ralph Thomas.[22]  This deed was never filed with the Hennepin County Registrar of Titles.[23]  In about March 2010, the Trustee received information that led him to believe that the source of the $75,000 had been misrepresented and was not, in fact, Ralph Thomas's funds.[24]  Upon learning of the likely misrepresentation, the Trustee elected not to demand the deed back or to unwind the transaction because, among other reasons, he did not believe that Northridge had any value for the estate.[25]  Neither the Trustee nor any other party in interest has alleged that NBAS or Palladium had any role in the alleged misrepresentations.

### E.   Redemption from the U.S. Bank mortgage foreclosure.

Approximately a year after the NBAS/Wagener judgment and the Koch Group judgment were obtained against Hecker, those judgments came to be filed as liens against Northridge. First, the NBAS/Wagener judgment was filed on April 20, 2010 as document number 4747121.[26] Neither NBAS nor Palladium had any involvement in the filing of the NBAS judgment against Northridge.[27]  Two days later, on April 22, 2010, the Koch Group judgment was filed as

---

[20] *Id.* D.E. 359 (Unsworn Certificate of Service).
[21] *Id.* D.E. 359 at 5.
[22] 2d Am. Compl. ¶ 34.
[23] *Id.* ¶ 35.
[24] Vehrs Decl. Ex. A at 14:7–16:3.
[25] *Id.* at 16:11–17:11.
[26] 2d Am. Compl. Ex. A.
[27] Wagener Aff. ¶ 3.

document number 4747638.[28]  On July 8, 2010, the Koch Group judgment was assigned to

Defendant Palladium in document number 4768580.[29]

Neither the Trustee nor Hecker redeemed from the U.S. Bank foreclosure sale.[30]  Indeed,

the Trustee had concluded "that [he] had disposed of the Northridge property and . . . had no

further interest in the property as trustee."[31]  Additionally, under state law, all lienholders junior

to a foreclosing party must either redeem from a foreclosure or lose their interests in the

property.[32]  MERS, GMAC, the IRS, and the remaining interested parties all failed to redeem

from U.S. Bank's foreclosure.  Accordingly, those parties' interests in Northridge were also

extinguished at the end of the mortgagor's redemption period.

On July 22, 2010, NBAS redeemed from U.S. Bank by paying $218,025.30.[33]  NBAS

then sold Northridge to Palladium via quitclaim deed and took a mortgage on the property in the

amount of $320,000.[34]  A week later, as a mere precaution, Palladium filed an additional

Certificate of Redemption from its position as holder of the junior Koch Group judgment.[35]  The

amount of that certificate accounted for both the NBAS judgment and the U.S. Bank mortgage.

### F.    This adversary proceeding.

Trustee Randall Seaver commenced this adversary proceeding against NBAS, Wagener,

and Palladium on July 26, 2010.  The Trustee's Second Amended Complaint, filed October 12,

2010, asserts avoidance claims regarding each of the following:

- The NBAS/Wagener pre-petition judgment against Hecker (Count I);

---

[28] 2d Am. Compl. Ex. A.
[29] *Id.*
[30] Vehrs Decl. Ex. A at 22:6–22:15.
[31] *Id.* at 43:25–45:5.
[32] *Petition of Brainerd Nat. Bank*, 383 N.W.2d 284, 289 (Minn. 1986).
[33] *Id.*
[34] *Id.*
[35] *Id.*

- The post-petition filing of the NBAS/Wagener judgment against Northridge (Count II);

- An alleged transfer of the NBAS/Wagener judgment to Palladium (Count III);

- The pre-petition Koch Group judgment against Hecker (Count IV); and

- The post-petition filing of the Koch Group judgment against Northridge (Count V).

In addition, the Second Amended Complaint asserts Count VI for declaratory relief, seeking a determination "that any purported redemption from the Koch Judgment by Palladium is without legal effect as said judgment was satisfied."[36]

## ARGUMENT

### I. Summary judgment standard.

Rule 56 of the Federal Rules of Civil Procedure governs this Court's analysis of this motion.[37] Rule 56 provides that summary judgment should be granted when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[38] Summary judgment is "not . . . a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."[39] On summary judgment, the Court serves as a gatekeeper, resolving actions for which a reasonable fact-finder could reach only one result.[40] To survive summary judgment, the nonmoving party must set forth specific facts that show there is a genuine issue of fact for trial.[41]

---

[36] 2d Am. Compl. ¶ 56.

[37] Rule 7056 of the Federal Rules of Bankruptcy Procedure provides that Rule 56 of the Federal Rules of Civil Procedure applies when a party moves for summary judgment in an adversary proceeding in Bankruptcy Court.

[38] Fed. R. Civ. P. 56(c)(2).

[39] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

[40] *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000).

[41] Fed. R. Civ. P. 56(e).

**II.    Counts I and IV regarding the pre-petition judgments obtained against Hecker fail because a judgment alone is not a preference.**

The Trustee asserts in his Second Amended Complaint that the judgments obtained by NBAS/Wagener and Koch Group[42] within 90 days before Hecker's petition constitute preferential transfers. A mere judgment, however—one that does not automatically create a lien on real property—does not constitute a preferential transfer of estate property. Accordingly, Counts I and IV must be dismissed.

Pursuant to 11 U.S.C. §101(54)(A), a transfer (for purposes of 11 U.S.C. §§ 547 & 549) includes "the creation of a lien." Under Minnesota law, judgments become liens on real property only as dictated by statute. Specifically, while a judgment becomes a lien on all *abstract* real property owned by the debtor within the county upon the docketing of the judgment in that county, the same is not true of Torrens property.[43] In the case of Torrens property, a judgment only becomes a lien on the judgment debtor's real property when a certified copy of the judgment is filed with the registrar of titles.[44] Because Northridge is Torrens property, and because the judgments at issue in this case were not filed with the registrar of titles prepetition, this distinction is critical.

Prior to the filing of Hecker's bankruptcy petition, then, the NBAS/Wagener judgment and the Koch Group judgment were nothing more than that. The judgments did not constitute a "transfer" of any property interest of Hecker.[45] Indeed, as courts applying § 547 have acknowledged, when the mere procurement of a judgment has no effect on the judgment debtor's

---

[42] Although the Trustee raises claims about the Koch Group judgment in his adversary complaint, those claims are moot for the reasons discussed at Section V below.

[43] Minn. Stat. § 548.09 subd. 1; *see also In re Keenan*, 96 B.R. 197, 199 (Bankr. D. Minn. 1989) ("the rules which apply to registered property differ from those applicable to unregistered land.").

[44] Minn. Stat. § 508.63.

[45] 11 U.S.C. § 547(b).

property, it does not constitute a transfer within the meaning of the Bankruptcy Code and is not avoidable as a preference.[46]  Additionally, the judgments did nothing to enable the judgment creditors to receive more than they would otherwise receive under chapter 7 of the Bankruptcy Code because the code treats allowed unsecured judgment creditors' claims no differently from any other allowed unsecured creditors' claims.  As a result, the judgments obtained against Hecker prepetition did not constitute avoidable preferences, and Counts I and IV, which seek relief under §§ 547, 550, and 551 must be dismissed.

**III.    Count III fails because there are no facts to support the Trustee's allegations.**

Count III of the Trustee's Second Amended Complaint asserts that "Palladium is either the immediate or the mediate transferee of the [NBAS/Wagener] Judgment or, alternatively, is the entity for whose benefit such transfer was made."[47]  This allegation is simply not true:  the NBAS/Wagener judgment was never transferred to any other person or entity.[48]  And as the Certificate of Title to Northridge demonstrates, the NBAS/Wagener judgment remained in the names of NBAS and Wagener at the time of filing against Northridge on April 20, 2010; NBAS was the entity that filed a Notice of Intent to Redeem against Northridge on June 23, 2010; and NBAS was the entity that filed a Certificate of Redemption from the U.S. Bank mortgage foreclosure on July 28, 2010.[49]  Because the entire factual underpinning of Count III is incorrect, Count III fails and must be dismissed.

---

[46] *See Matter of Lucasa Intern., Ltd.*, 14 B.R. 980, 981 (Bankr. S.D.N.Y. 1981); *see also In re Mason*, 69 B.R. 876, 881 (Bankr. E.D. Pa. 1987) ("It does not seem logical to us that the entry of a judgment, or even the entry of a court order requiring payment of a debt as of a date certain, can constitute a transfer of all interests of the Debtor . . .  We believe that only the payment itself constitutes a transfer.").
[47] 2d Am. Compl. ¶ 40.
[48] Wagener Aff. ¶ 3.
[49] 2d Am. Compl. Ex. A.

## IV.    Counts II and V regarding the post-petition judgment liens against Northridge fail.

### A.    The judgment liens were not filed against "property of the estate" because the Trustee had previously abandoned Northridge.

In Counts II and V of the Second Amended Complaint, the Trustee alleges that the filing of the NBAS/Wagener judgment and of the Koch Group judgment against Northridge constituted avoidable post-petition transfers of property of the estate.  But by virtue of the Trustee's Settlement Agreement with Hecker, Rowan, and Thomas—entered into following a formal motion and with approval of the Court—and the Trustee's Deed to Northridge executed in favor of Thomas, the Trustee abandoned Northridge.  Accordingly, Northridge was no longer "property of the estate" when the judgment liens were filed against the property, and they therefore did not constitute avoidable transfers under 11 U.S.C. § 549.

The Bankruptcy Code provides the Trustee with the power to abandon property of the estate.  "If there is no equity in the collateral for the bankruptcy estate or if the property is burdensome to the estate, the trustee generally abandons the property pursuant to 11 U.S.C. § 554(a), an uncomplicated ministerial act that occurs on numerous occasions in literally thousands of cases."[50]  And where the total debt encumbering a property exceeds its scheduled value, abandonment is typically called for.[51]  This is because "a trustee's primary duty is to the unsecured creditors rather than to the secured creditors."[52]  Before estate property can be abandoned, the Trustee must comply with the statutory requirements of "notice and a hearing."[53]

This is precisely what the Trustee did in this case in January and February 2010.  On January 7, the Trustee filed a motion seeking court approval of a Settlement Agreement

---

[50] *In re Thu Viet Dinh*, 80 B.R. 819, 822 (Bankr. S.D. Miss. 1987).
[51] *Id.*
[52] *Id.*
[53] 11 U.S.C. § 554.

disposing of Northridge.[54]  In that motion, in compliance with the requirements of § 554, Fed. R. Bankr. P. 6007, and Local Rule 6007-1, the Trustee provided twenty days' notice to all creditors that a motion would be held on January 27 and represented that he "believes that this Settlement Agreement is in the best interest of the estate. **Northridge is not believed to have equity** and secured creditors are foreclosing on their liens."[55]  After the Court granted the Trustee's motion and approved the Settlement Agreement, the Trustee in fact proceeded to execute a deed to Northridge in February 2010.[56]  Indeed, the only thing the Trustee might argue was missing— and which is notably *not* required to abandon estate property—was the word "abandonment."[57] This is consistent with the Trustee stated belief and intent:  he concluded that he "had disposed of the Northridge property had . . . had no further interest in the property as trustee."[58]

Further, even if the Court determines that the procedures followed by the Trustee did not fulfill all of the abandonment requirements of § 554, they nonetheless constituted a constructive abandonment.  "Abandonment requires some affirmative action or some evidence of intent to abandon."[59]  Here, the Trustee indeed took affirmative steps that demonstrated his intent to abandon Northridge for the estate's purposes:  he gave notice to all creditors; he provided more than 14 days' notice; he held a hearing on the matter; he noted that Northridge had no value to the estate; and he subsequently represented to others, either personally or through his counsel, that he had disposed of Northridge.  Accordingly, at a minimum, the Trustee's actions constituted constructive abandonment to the same end as § 554 abandonment.

---

[54] Case No. 09-50779 D.E. 359.
[55] *Id.*, emphasis added.
[56] 2d Am. Compl. ¶ 34.
[57] 11 U.S.C. § 554.
[58] Vehrs Decl. Ex. A at 43:25–45:5.
[59] *In re Squire*, 282 Fed.Appx. 413, 415 (6th Cir. 2008).

The effect of the Trustee's motion and settlement agreement, then, was to remove Northridge from the scope of "property of the estate."[60] At that point, "the property [became] part of the debtor's non-bankruptcy estate, just as if no bankruptcy had occurred . . . and any creditors were free to pursue their interests in the land."[61] As a result, the filing of the NBAS/Wagener judgment and the Koch Group judgment against Northridge did not amount to transfers of estate property.[62]

The Trustee may argue that his abandonment of Northridge should be revoked because of suspicious circumstances involving the settlement with Ralph Thomas that he has since discovered. But this argument misses the point: no facts relating to Northridge itself, the encumbrances on Northridge, or the negative value of Northridge are in question. Only the source of the $75,000 that the Trustee took in exchange for the vastly over-encumbered property is in question. Further, courts have repeatedly held that, absent very limited circumstances, the abandonment of estate property is irrevocable. Consistent with the rationale for denying revocation here, those limited circumstances primarily contemplate misinformation about the abandoned asset itself, and include "where (1) the trustee is given incomplete or false information about the asset by the debtor; (2) the debtor has failed to list the asset on the schedules and petition altogether; or (3) the trustee's abandonment was the result of a mistake or inadvertence."[63] None of those circumstances exists in this case, and accordingly the Trustee may not revoke his abandonment of Northridge.

For the reasons discussed above, the Trustee's Counts II and V must be dismissed.

---

[60] *In re Moody*, 277 B.R. 858, 861 (Bankr. S.D. Ga. 2001).

[61] *Id.*; *see also In re Olson*, 930 F.2d 6, 8 (8th Cir. 1991) ("Upon abandonment, property ceases to be property of the estate and title reverts to the debtor.").

[62] 11 U.S.C. § 549(a).

[63] *In re Wick, 249* B.R. 900, 914 (Bankr. D. Minn. 2000) (rev'd on other grounds); *see also In re Ozer*, 208 B.R. 630, 633 (Bankr. E.D.N.Y. 1997).

**B.** **Even if Northridge had still been "property of the estate," the liens had no value, and there is nothing for the Trustee to recover under § 550.**

Notwithstanding the fact that the Trustee may not challenge the filing of the judgment liens against Northridge for the reasons discussed above, there is nothing that the Trustee could recover from NBAS and Palladium even if the filing of the liens had constituted transfers of estate property. Under 11 U.S.C. § 550(a), when a transfer is avoided under § 549, the Trustee may recover, "for the benefit of the estate," either the property transferred or the value of that property. "The purpose of § 550 is to restore the debtor's financial condition to the state it would have been had the transfer not occurred."[64] The first option, recovery of the property itself, is not possible in light of the relevant facts: a judgment lien is not tangible property that can be turned over, nor do the liens themselves even exist anymore.[65] The Court must therefore look to the value of the liens at the time of the alleged transfers to determine what the Trustee could recover.[66]

The NBAS/Wagener and the Koch Group judgment liens had no value whatsoever at the time they were filed against Northridge—or indeed at any time prior to the expiration of the mortgagor's period of redemption (regardless of whether that redemption right was held by the Trustee, Hecker, or Thomas). As the Trustee himself concluded, "the amount of those liens [on Northridge] far exceeded the value of the property."[67] This is also consistent with the position taken by U.S. Bank—and not opposed by the Trustee—in support of the bank's September 2009

---

[64] *In re Sickels*, 392 B.R. 423, 426 (Bankr. N.D. Iowa 2008).

[65] *See, e.g.*, *In re Schwartz*, 383 B.R. 119, 126 (8th Cir. BAP 2008) ("[T]he Lenders cannot merely return [their mortgages] to the estate. Accordingly, the only remedy available to the estate is a money judgment for the value of the mortgages.").

[66] *In re Int'l Ski Serv., Inc.*, 119 B.R. 654, 659 (Bankr. W.D. Wis. 1990) ("It is generally agreed that '[t]he market price at the time of transfer is the proper measure of damages.'"); *see also In re McLaughlin*, 183 BR. 171, 177 (Bankr. W.D. Wis. 1995).

[67] Vehrs Decl. Ex. A at 6:12−6:19.

motion for relief from the automatic stay.[68]  In short, because the value of the encumbrances on Northridge already far exceeded the value of the property itself, the judgment liens had no value. Thus, to the extent the filing of the liens could be deemed avoidable transfers under § 549, there is no value for the Trustee to recover under § 550(a).[69]

### C.    The Trustee has no standing to bring claims against NBAS and Palladium under § 550 because any "value" in Northridge belonged to others, not to the estate.

What apparently bothers the Trustee is the fact that NBAS ultimately redeemed from the U.S. Bank mortgage foreclosure on July 22, 2010 by paying only $218,025.30.[70]  But the value that NBAS may have realized came about because the interests of MERS, GMAC Mortgage Corporation, and the IRS were extinguished when they failed to redeem.  If there was any transfer of property or value, therefore, it was solely from U.S. Bank, MERS, GMAC, or the IRS to NBAS.[71]  And notably, the Trustee does not seek to—or have standing to—avoid that fact.[72]

The case of *Pearson Industries, Inc.* illustrates why the Trustee has no claims against NBAS and Palladium under § 550.[73]  In *Pearson*, the two related and commonly owned debtor companies, Pearson Industries, Inc. ("Pearson") and Industrial and Municipal Engineering, Inc.

---

[68] Case No. 09-50779, D.E. 181 (stating that "there is no equity in the property").

[69] *See In re Schwartz*, 383 B.R. 119, 126–27 (8th Cir. BAP 2008) (holding that the "estate is entitled to recover the preferential value of the mortgages" because the "property had sufficient value to support the mortgages."); *see also In re Pearson Inds., Inc.*, 178 B.R. 753, 767 (Bankr. C.D. Ill. 1995) ("[I]f a debtor owns property subject to a creditor's lien which amount exceeds the value of the property, the property is 'property of the estate,' but there is no 'benefit to the estate' as the lien exceeds the property's value.").

[70] 2d Am. Compl. Ex. A.

[71] *See In re Joing*, 82 B.R. 500, 503 (Bankr. D. Minn. 1987) ("If the profit represented the transferred interests of anyone, it was the ultimately transferred interests at expiration of redemption of [junior lienholders].").

[72] *See id.*

[73] For facts of case, see *In re Pearson Inds., Inc.*, 147 B.R. 914, 915–17 (Bankr. C.D. Ill. 1992); for applicable analysis and holding, see *In re Pearson Inds., Inc.*, 178 B.R. 753 (Bankr. C.D. Ill. 1995).

("IME"), had an ongoing relationship with defendant McCord Auto Supply, Inc., whereby McCord supplied Pearson and IME with specialty industrial tires for incorporation into the machines they manufactured.[74]  Prior to Pearson and IME's bankruptcies, McCord regularly supplied them with tires by delivering the tires to a warehouse owned by Pearson, but to which Pearson, IME, and McCord all retained access for taking tires for their own or other customers' needs.  In stage one of the litigation, the court determined that the tires had become the property of Pearson and IME, for UCC purposes, upon being delivered to the warehouse, and were thus encumbered by the blanket UCC liens of two lenders.[75]  The court therefore held that McCord had made an avoidable transfer under § 549 when it shipped all of the tires stored in that warehouse to its own separate warehouse post-petition.[76]

In stage two of the *Pearson* litigation, the court analyzed what damages the trustee could recover from McCord under § 550.  The court noted that "McCord has disposed of the inventory, so it cannot be returned.  Therefore, the Trustee is entitled to a monetary recovery if the Trustee can bring himself within the scope of § 550."[77]  The Trustee argued that because the Code defines "property of the estate" broadly in § 541, that "any diminution of the bankruptcy estate is a 'transfer' of property of the estate and preferential."[78]  The court, however, drew an important distinction between avoidable transfers and recovery under § 550, and held as follows:

> This argument misses the point as a "transfer" is a requirement under § 547.  That hurdle has been crossed by the Trustee during Stage One.  It is not a requirement under § 550.  Furthermore, the phrases "property of the estate" and "for the benefit of the estate" can have different consequences.  For example, if a debtor owns property subject to a creditor's lien which amount exceeds the

---

[74] 147 B.R. at 915–16.
[75] 178 B.R. at 755.
[76] *Id.* at 754.
[77] *Id.* at 756.
[78] *Id.* at 767.

value of the property, the property is "property of the estate," but there is no "benefit to the estate" as the lien exceeds the property's value. That is the fact in this case.

For these reasons, this Court finds that any recovery that the Trustee would receive from McCord would not be for the "benefit of the estate," and therefore, the Trustee is not entitled to recover under § 550 of the Bankruptcy Code.[79]

Assuming that a "transfer" occurred under §§ 547 or 549—which, as discussed above, NBAS and Palladium dispute—the outcome in *Pearson* is determinative of this case. Just as the tires were fully encumbered by banks' liens in *Pearson*, so too was Northridge vastly over-encumbered by mortgages and a federal tax lien when the NBAS and Koch Group judgments were filed against the property. And just as the tires had no value and no benefit to the estate when the transfer occurred, so too was Northridge of no value or benefit to the estate when the judgments were filed. Accordingly, the Trustee has no valid claim against NBAS and Palladium under § 550, and the Court should reject the Trustee's *post hoc* attempts through Counts II and V to portray the judgment liens as having any recoverable value.

## V. Count VI regarding Palladium's junior-lienholder redemption by way of the Koch Group judgment is moot.

In the Second Amended Complaint, the Trustee asserts Count VI for declaratory relief against Palladium, seeking a determination that "any purported redemption from the Koch Judgment by Palladium is without legal effect as said judgment was satisfied."[80] This claim is moot, however. After NBAS redeemed from the U.S. Bank mortgage foreclosure, it transferred its ownership interest in Northridge to Palladium. The junior lien after the NBAS judgment (stemming from the original Koch Group judgment) was also held by Palladium.[81] Merely out of an abundance of caution, therefore, Palladium "redeemed" from itself after it already owned

---

[79] *Id.*
[80] 2d Am. Compl. ¶ 56.
[81] 2d Am. Compl. Ex. A.

Northridge.  Palladium agrees with the Trustee—albeit for a different reason—that this redemption had no further legal effect.  Count VI should therefore be dismissed as moot.

**VI.  The Trustee may not challenge Defendants' redemptions because the Trustee's claims are only fashioned to punish NBAS and Palladium, not to restore the estate to the position it would have been in absent the "transfers."**

"The purpose of Section 550 is to restore the debtor's financial condition to the state it would have been had the avoided transfer not occurred."[82]  In this case, without the filing of the judgment liens against Northridge and subsequent junior-creditor redemption, the Trustee would still have found himself in precisely the position he is in now:  the equity that was created in Northridge would have gone either to U.S. Bank or to another secured creditor, not to the estate.[83]  The apparent value that NBAS and Palladium received resulted strictly from the failure of junior mortgagees and the IRS to redeem after the mortgagor's period for redemption had expired.  In Minnesota, such outcomes arise everyday and as a matter of course under mortgage-foreclosure laws; it does not, however, mean that the Bankruptcy Code gives the Trustee the ability to collect anything from NBAS or Palladium.  In short, because the estate is in no worse condition as a result of NBAS's redemption than it would have been absent that redemption, § 550 does not give the Trustee a cause of action against NBAS or Palladium.

Finally, the Trustee's claims lack merit because the ultimate effect of the actions alleged in the Second Amended Complaint was to allow two additional creditors to be made whole and thus not to be at the table along with all other creditors in the case competing for the assets of the estate.  As courts have consistently recognized, "the proper focus in these actions is not on what the transferee gained by the transaction, but rather on what the bankruptcy estate lost as a result

---

[82] *In re Schwartz*, 383 B.R. 119, 125 (8th Cir. BAP 2008).
[83] *See Joing, supra*.

of the transfer."[84]  Because MERS, GMAC, the IRS, and others all failed to redeem from the

U.S. Bank mortgage foreclosure, the newly created equity in Northridge would simply have gone

to U.S. Bank absent redemption by NBAS.  It would not, in any event, have become the property

of the bankruptcy estate.[85]  But because NBAS redeemed, both it and Palladium, as purchaser of

the Koch Group judgment, have been made whole and are not present to compete against other

creditors for the limited assets of the estate.

## CONCLUSION

Defendants NBAS and Palladium respectfully request entry of summary judgment.  As

discussed above, the Trustee's claims fail because none of the actions complained of amounted

to prohibited "transfers" under the Bankruptcy Code.  First, the simple act of obtaining a

judgment during the preference period does nothing to affect any property interests of the debtor

and is therefore not a "transfer."  And second, the filing of the judgments against Northridge did

not constitute "transfers" because the Trustee had already abandoned the property for the estate's

purposes by that time.  Furthermore, even if Northridge was still property of the estate at the time

the judgments were filed, the judgment liens had no value that the Trustee may recover under §

550.  For these reasons, the Trustee's adversary complaint should be dismissed.

---

[84] *In re Maddalena*, 176 B.R. 551, 557 (Bankr. C.D. Cal. 1995); *see also In re Integra Realty Resources, Inc.*, 354 F.3d 1246, 1267 (10th Cir. 2004).
[85] *See In re Joing*, 82 B.R. 500, 503 (Bankr. D. Minn. 1987) ("[T]he profit complained of was not an interest of the Debtor transferred at the sale; . . . in fact, the profit did not represent an interest of the Debtor at all.").

DATED:  December 22, 2010

**LINDQUIST & VENNUM PLLP**

By  /s/ William P. Wassweiler
    William P. Wassweiler (#232348)
    wwassweiler@lindquist.com
    James M. Lockhart (#176746)
    jlockhart@lindquist.com
    Karla M. Vehrs (#0387086)
    kvehrs@lindquist.com
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)

**ATTORNEYS FOR NEW BUFFALO
AUTO SALES, LLC AND
PALLADIUM HOLDINGS, LLC**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

Dennis E. Hecker

             Debtor.

| | |
|---|---|
| Randall L. Seaver, Trustee, | Adv. File No. 10-5027-RJK |
| Plaintiff, | Bky. File No. 09-50779-RJK |
| vs. | |
| New Buffalo Auto Sales, LLC, f/k/a Buffalo Chrysler, LLC, Maurice J. Wagener, and Palladium Holdings, LLC, | **AFFIDAVIT OF KARLA M. VEHRS** |
| Defendants. | |

STATE OF MINNESOTA      )
                        ) ss.
COUNTY OF HENNEPIN      )

       I, Karla M. Vehrs, hereby state and testify as follows:

1.     I am an attorney with Lindquist & Vennum P.L.L.P., attorneys for Defendants New

Buffalo Auto Sales, LLC ("NBAS") and Palladium Holdings, LLC ("Palladium").  I

make this Declaration in support of NBAS and Palladium's motion for summary

judgment

2.     Attached hereto as <u>Exhibit A</u> is a true and correct copy of the transcript from the

December 21, 2010 Deposition of Trustee Randall L. Seaver in this matter.


Dated:  December 22, 2010          /e/ Karla M. Vehrs                    /
                                        Karla M. Vehrs

EXHIBIT A

### Page 1

1  UNITED STATES BANKRUPTCY COURT
2  DISTRICT OF MINNESOTA
3  ------------------------------------------------------------
4  In re:                              BKY No. 09-50779
5  Dennis E. Hecker,
6     Debtor.
7  ------------------------------------------------------------
8  Randall L. Seaver, Trustee,        ADV No. 10-5027
9     Plaintiff,
10    vs.
11 New Buffalo Auto Sales, LLC,
12 a Minnesota limited liability company,
13 f/k/a New Buffalo Chrysler, LLC,
14 Maurice J. Wagener, and Palladium Holdings
15 LLC,
16    Defendants.
17 ------------------------------------------------------------
18    DEPOSITION OF RANDALL L. SEAVER
19 DATE:    December 21, 2010
20 TIME:    9:16 AM
21 PLACE:   Lindquist & Vennum
22       4200 IDS Center, 80 South Eighth Street
23       Minneapolis, Minnesota 55402
24 REPORTED BY:    Elizabeth J. Gangl, RPR
25       Notary Public, State of Minnesota

### Page 2

1           APPEARANCES
2
3  On Behalf of the Plaintiff:
4     Matthew R. Burton, Esq.
5     Leonard, O'Brien, Spencer, Gale & Sayre, Ltd.
6     100 South Fifth Street
7     Suite 2500
8     Minneapolis, Minnesota 55402-1234
9     612-332-1030
10    mburton@losgs.com
11 On Behalf of Defendants New Buffalo Auto Sales and
12 Palladium Holdings:
13    James M. Lockhart, Esq.
14    Karla Vehrs, Esq.
15    Lindquist & Vennum
16    4200 IDS Center
17    80 South Eighth Street
18    Minneapolis, Minnesota 55402
19    612-371-3211
20    jlockhart@lindquist.com
21    kvehrs@lindquist.com
22
23
24 NOTE:  The original deposition transcript will be
25 delivered to James M. Lockhart, Esq.

### Page 3

1           INDEX
2  WITNESS:  RANDALL L. SEAVER            PAGE
3     EXAMINATION BY MR. LOCKHART.................   4
4
5
6  OBJECTIONS.................................. 8, 18, 22, 23
7
8
9  SEAVER EXHIBITS MARKED:
10 Exhibit 1:  Handwritten notes made by Seaver
11    Re:  Conversation with Van Beek................   27
12 Exhibit 2:  7/23/10 Certificate of Title............   39
13 Exhibit 3:  11/10/10 email to Burton from
14    Jacobson re:  Ralph Thomas....................   41
15
16
17
18 (Original exhibits attached to original transcript;
19 copies to counsel.)
20
21
22
23
24
25

### Page 4

1           RANDALL L. SEAVER,
2     duly sworn, was examined and testified as follows:
3           EXAMINATION
4  BY MR. LOCKHART:
5     Q.  Good morning, Mr. Seaver.
6     **A.  Good morning.**
7     Q.  Why don't you state your full name for the
8  record, please?
9     **A.  It's Randall Seaver.**
10    Q.  And, Mr. Seaver, you're appearing here as the
11 plaintiff in an adversary proceeding pending in the
12 Dennis Hecker bankruptcy, correct?
13    **A.  Yes.**
14    Q.  And you are the plaintiff in the adversary
15 proceeding brought against New Buffalo Auto, my clients
16 New Buffalo Auto Sales, LLC and Palladium Holdings, LLC,
17 is that correct?
18    **A.  In my capacity as trustee, yes.**
19    Q.  All right.  When were you first appointed
20 trustee?
21    **A.  In this case?**
22    Q.  In this case.
23    **A.  It would either have been the day it was filed,**
24 **June 4th, or the day after, June 5th, but I think it was**
25 **the 4th.  Of '09.**

Page 5

1    Q.   And my questions are going to focus on the real
2   property that's the subject of this adversary proceeding.
3   If we refer to that property as Northridge, will we be
4   communicating?
5    A.  Yes.
6    Q.   When you were appointed as trustee, what
7   investigation did you undertake with respect to the
8   Northridge property?
9    A.  Well, I checked, as best I could, the value of
10  North State.  I looked at --
11       MR. BURTON:  Northridge.
12       THE WITNESS:  Yeah.  There's a North State
13  involved in this case.  I checked, as best I could, the
14  value of Northridge.  I looked at Mr. Hecker's schedules
15  in which he was required to list the value of the
16  property and the encumbrances on the property.  I also
17  became aware of a purported lease between Mr. Hecker and
18  a Christi Rowan that purported to encumber Northridge.
19   Q.  (By Mr. Lockhart)  Anything else?
20   A.  I might have looked at the assessor records
21  online at the time.  By that I mean the county assessor
22  market, estimated market valuation for the property.
23   Q.   And what do you recall about liens that were
24  outstanding against the property?
25   A.  Well, to be specific, I would have to look at

Page 6

1   Mr. Hecker's schedules, but I knew that there was a first
2   lien, and I can't recall, Mr. Lockhart, if I, if what I'm
3   telling you is what I knew right then or what I came to
4   know later, but there was a first lien for sure in favor
5   of U.S. Bank, and then there were two subsequent mortgage
6   liens after that.  I think it's GMAC.
7    Q.   Anything else?
8    A.  There's also an IRS lien out there.  I don't
9   remember if it was memorialized on the certificate
10  because I didn't look at the certificate back then, but
11  there is an IRS lien out there as well.
12   Q.   And did you conclude that the total amount of
13  those liens exceeded the value of the property?
14   A.  I concluded that were I to sell the property,
15  pay off the liens and deal with the lease issue, I
16  wouldn't realize anything for the estate.
17   Q.   And, in fact, the amount of those liens far
18  exceeded the value of the property, didn't they?
19   A.  In my opinion, they did.
20   Q.   And at what point in time did you come to
21  understand that U.S. Bank was going to seek to lift the
22  automatic stay and proceed with foreclosure?
23   A.  Well, I don't recall the exact date, but if you
24  look at the date they filed, U.S. Bank filed its stay of
25  relief motion, it would be about that date I would have

Page 7

1   gotten notice of that.
2    Q.   Had you had any communication with U.S. Bank
3   prior to their filing?
4    A.  I spoke with their -- prior to their filing the
5   stay of relief motion?
6    Q.   Correct.
7    A.  I spoke with Eric Sherburne, the attorney who
8   was bringing the stay of relief motion, either shortly
9   before or shortly after the stay of relief motion was
10  filed.
11   Q.   And did you have any intention of opposing the
12  relief sought by U.S. Bank?
13   A.  No.
14   Q.   And that was part and parcel of, with your
15  decision or conclusion that there wasn't any value in the
16  property for the estate, correct?
17   A.  It was consistent with my opinion that there
18  wasn't value there for the estate.
19   Q.   All right.  And, again, consistent with that
20  conclusion, you didn't have any intention, as trustee, of
21  redeeming the property from U.S. Bank's foreclosure?
22   A.  I had no such intention.
23   Q.   What did you do then after the stay was lifted
24  and as the foreclosure process proceeded?  Did you do
25  anything to monitor that foreclosure process?

Page 8

1    A.  I did not.
2    Q.   All right.  At some point in time you made a
3   decision to dispose of whatever nominal interest the
4   estate had in the property, is that correct?
5        MR. BURTON:  Objection, I don't think that
6   states the proper facts.  I mean are you asking him if
7   he -- you're saying a nominal interest?  I mean he had
8   the full interest at the time the case was commenced.
9        MR. LOCKHART:  Well, whatever the value
10  was.  I guess I'm interjecting a concept of value but he
11  can answer the question.  If you think it's vague --
12       MR. BURTON:  Yeah, I think it's vague and
13  confusing because there's a fee title issue and there's
14  an equity issue, and I think your question is unclear
15  which one you're talking about.
16       MR. LOCKHART:  That's fine, I'll take out
17  the concept of valuation.
18   Q.  (By Mr. Lockhart)  At some point in time you
19  made a decision to dispose of the estate's interest in
20  the property, correct?
21   A.  I did.
22   Q.   And how did those discussions come about?
23   A.  Well, most of the discussions, perhaps all of
24  the discussions, would have been between Mr. Burton and
25  Mr. Skolnick, who was representing, as I recall, at the

Page 9

1  time he was representing Christi Rowan, he was certainly
2  representing Mr. Hecker, I'm not certain when he began
3  representing Ralph Thomas. So my discussions would have
4  been with my attorney.
5      Q. Okay. Did you have any direct discussions with
6  Mr. Skolnick about the transfer of Northridge to
7  Mr. Thomas?
8      A. I don't recall if I did or not.
9      Q. Tell me this. Is it your understanding that
10  Mr. Burton contacted Mr. Skolnick about the proposed
11  transfer of the property or did Mr. Skolnick come to
12  Mr. Burton?
13      A. I don't recall how, who initiated that. The
14  context it came up in, though, if that's what you're
15  getting at here --
16      Q. That would be helpful.
17      A. -- had to do with a contempt motion against
18  Christi Rowan.
19      Q. And that related to lease payments?
20      A. She, as I recall, there was an order that
21  required her to make payments under the purported lease
22  that she held with Northridge. She had not made those
23  payments to me, and we had put a motion on, as I recall,
24  a contempt motion, relating to the failure to make those
25  payments.

Page 10

1      Q. And do you recall roughly what the amount of
2  payments that were in arrears amounted to?
3      A. What sticks in my mind is 60,000, but I'm not
4  certain that's accurate.
5      Q. You've referred to a purported lease. Was there
6  a written agreement?
7      A. I have seen two different versions of a written
8  agreement between Christi Rowan and Denny Hecker for
9  Northridge.
10      Q. And what was the monthly lease amount?
11      A. 5,000 is what sticks in my mind. As to the
12  amount that was in default, of course, if you looked at
13  that contempt motion it would tell you what it was, but
14  the number I gave you is what sticks in my mind.
15      Q. All right. So in your capacity as trustee there
16  was a proposal, whether it was initiated by you or by
17  Mr. Skolnick representing one or more parties, there was
18  a proposal to resolve that contempt issue by transferring
19  the property to Mr. Thomas?
20      A. That's it in a nutshell, yes.
21      Q. And the price that was set, I understand,
22  ultimately came to be $75,000, is that correct?
23      A. That is right.
24      Q. And how was that dollar amount determined?
25      A. Through negotiations.

Page 11

1      Q. And in addition to -- I'm trying to determine
2  what the, what the variables or, you know, concepts were
3  in terms of the negotiation. One we've already talked
4  about was the contempt issue, the lease payments that
5  were in arrears, correct?
6      A. Yes.
7      Q. The other would be some concept of value of the
8  estate's interest in the fee, correct?
9      A. Well, I didn't believe there was a value there,
10  as I've already told you. I mean the fee title I thought
11  was subject to these encumbrances and encumbered by a
12  lease.
13      Q. And so, at most, the value of that would be
14  nominal, correct?
15      A. The value of what?
16      Q. Of the estate's interest in the fee.
17      A. Of the fee ownership interest when I was
18  negotiating that $75,000 payment?
19      Q. Correct.
20      A. Yes.
21      Q. And I recall there being some issue related to a
22  piano?
23      A. Yeah. Here's what I remember and, you know, if
24  you look at the motion seeking approval of it, if I'm
25  wrong, it will tell you what the accurate version is. My

Page 12

1  recollection is that it included, the $75,000 included me
2  delivering a deed to Ralph Thomas for Northridge and
3  giving up the rights to a piano that was at Northridge,
4  and then it would also, because I was delivering the
5  property, got Christi Rowan off the hook for the contempt
6  motion, too.
7      Q. And did that piano, did you have an idea of the
8  value of that piano?
9      A. Mr. Hecker might have scheduled it for a certain
10  value. I don't know if that value was accurate or not.
11  Moving pianos and selling them, I don't do that as a
12  trustee, not personally I don't move them, but I didn't
13  attribute a lot of net value to the piano.
14      Q. And the settlement was approved by the
15  bankruptcy court?
16      A. It was.
17      Q. And the transfer of the -- that included an
18  approval of the disposition of the property by
19  transferring it to Mr. Thomas, correct?
20      A. It provided me with authorization as trustee to
21  transfer the estate's interest in the real property to
22  Mr. Thomas.
23      Q. And you did that?
24      A. I signed a deed and gave it to my attorney, a
25  deed from me to Ralph Thomas.

Page 13

1  Q. And funds were tendered by Mr. Skolnick,
2  correct?
3  A. They were.
4  Q. And the trustee has retained those funds to the
5  estate?
6  A. I have.
7  Q. And roughly when did that transfer occur?
8  A. It was early 2010, but I don't remember. I mean
9  the docket, if you're asking me -- let me go back to your
10 question. I don't know if there ever was a transfer. If
11 you're asking me when I signed the deed, it was early
12 2010, and I gave the deed to my attorney.
13 Q. And would that have been sometime after Judge
14 Kressel issued his order?
15 A. It would have been.
16 Q. So if that order is dated January 27th of 2010,
17 it would have been some time shortly after that that you
18 signed the deed?
19 A. It would have been after that. If you looked at
20 the notarization on my signature you would see the date.
21 I just don't recall.
22 Q. And the deed was actually delivered to
23 Mr. Thomas or his counsel, correct?
24 A. My recollection is that I gave it to Mr. Burton.
25 I believe it ended up with Mr. Skolnick, William

Page 14

1  Skolnick. I know -- well, that's what I believe.
2  Q. And you delivered it to your counsel with that
3  understanding and expectation, or that direction; that he
4  would deliver it to Mr. Thomas or someone you understood
5  to be acting on his behalf?
6  A. I did.
7  Q. Okay. And I understand that within a couple of
8  months thereafter you had some questions about the source
9  of the funds that were provided to you, delivered to you
10 pursuant to that settlement agreement, correct?
11 A. Well, actually we had questions about the source
12 of funds before the agreement was ever approved because
13 earlier in the case, when I had been attempting to sell,
14 I think it was Baxter, or the estate's interest, however
15 the Baxter sale occurred, Chrysler had raised the issue
16 about making sure of the source of funds. I think it was
17 Baxter. I could be wrong about -- oh, you know what it
18 was? It was some docks that I was going to sell to
19 Mr. Hecker, they were up in Baxter or Cross Lake, and he
20 proposed, Mr. Hecker did, to buy those from me, and
21 something else in addition to the docks, and Chrysler
22 said, put in, as I recall it, a request that there be
23 some proof of the source of those funds, which I'm
24 concerned with, too. I didn't want it to be funds that
25 the estate was entitled to just being given to me to get

Page 15

1  something else from the estate. What I'm telling you
2  about Chrysler and the sale of the dock or the attempted
3  sale never went through, had happened earlier in the
4  case. So when we started talking about this $75,000 and
5  the transfer of the estate's interest and letting Christi
6  Rowan off, I wanted to make certain that the money that
7  was being given to me wasn't money that I would just be
8  entitled to as trustee otherwise. So we wanted to know
9  where the money was coming from.
10 Q. And what did you do to satisfy yourself that
11 these were funds that were not already property of the
12 estate?
13 A. Well, I wasn't at the hearing when -- Mr. Burton
14 and Skolnick were at this hearing in front of Judge
15 Kressel. I wasn't there. But it, my understanding is
16 the funds were coming from Ralph Thomas, and the check
17 that I received, the $75,000 check from Mr. Skolnick's
18 trust account, has a memo that says Ralph Thomas on it,
19 so I believed that.
20 Q. So then going back to my earlier question,
21 within a couple of months, I believe, you came to
22 question that belief?
23 A. I think it was in March of 2010 that we met.
24 Mr. Burton, my attorney, received documents from
25 Mr. Skolnick, a redacted statement from his trust account

Page 16

1  showing funds coming into his trust account that appeared
2  to have funded this purchase, and it raised to me
3  substantial issues.
4  Q. And you proceeded to, I believe you wrote a
5  letter to Judge Kressel about your concerns?
6  A. Mr. Burton did. The letter is signed by Matt
7  Burton, and it's on file with the court.
8  Q. I didn't recall if it was you personally or your
9  counsel, but same effect?
10 A. Yeah.
11 Q. Okay. And at that point did you take any
12 further action to, with respect to that transaction and
13 these concerns that you had?
14 A. I'm not sure what --
15 Q. Well, did you demand the deed back?
16 A. No.
17 Q. Did you take some action, did you instruct
18 Mr. Burton to make a motion before the bankruptcy court
19 to, in effect, unwind that transaction that had occurred
20 with court approval?
21 A. No.
22 Q. And is my understanding correct that you didn't
23 do those things because, again, you didn't think there
24 was any value in the property for the estate?
25 A. Well, that's part of it. The other part is

Page 17

1  pursuing Christi Rowan for money, I can't recall when I
2  got a large judgment against her, but I, as trustee I
3  have a large judgment against her, so by now more time
4  had passed on the lease and now I would have to pursue
5  Christi Rowan for yet more money on the lease, which I
6  didn't believe she had to start with.  So it was a
7  combination of my belief that there was not equity in the
8  property and the fact that I, I would spend more
9  attorney's fees chasing Christi Rowan trying to get money
10 that I didn't believe Christi Rowan had if I went down
11 that road.
12     Q.  And that would be, in terms of recovering
13 amounts that might have been due under this, what you
14 referred to as the purported lease?
15     A.  Right.  She was supposedly going to pay 5,000 a
16 month, if I recall correctly, on the lease.
17         MR. BURTON:  And it was in fact due.  I
18 mean it was a court order directing her to pay.
19         MR. LOCKHART:  And that's fine, I was just
20 using Mr. Seaver's, referring back to his reference to a
21 purported lease.
22     Q.  (By Mr. Lockhart)  Do you know whether Ms. Rowan
23 made, continued to have some lease arrangement with
24 Mr. Thomas?
25     A.  I have no personal knowledge.  I had heard

Page 18

1  rumors that in the unlawful detainer that might have come
2  up, but I have no personal knowledge.
3      Q.  Okay.  And do you know whether she, after the
4  transfer, after you transferred the property to
5  Mr. Thomas, do you know whether Ms. Rowan made any lease
6  payments or other payments of any kind to Mr. Thomas?
7          MR. BURTON:  Object.  Calls for a legal
8  conclusion as to the transfer.
9          MR. LOCKHART:  I'm not asking for a legal
10 conclusion.  I'm talking about the transfer, the
11 transaction that occurred.  We can argue about the effect
12 of that.
13         THE WITNESS:  Your question is after I
14 signed --
15     Q.  (By Mr. Lockhart)  The deed.
16     A.  -- and gave it to my attorney to pass on, am I
17 aware of whether Ms. Rowan made any payments to
18 Mr. Thomas?
19     Q.  Correct.
20     A.  I'm not aware of whether she did or not.
21     Q.  Fair enough.  When you instructed your counsel
22 to negotiate with Mr. Skolnick regarding the transfer of
23 the property, did you seek any competing transactions,
24 you know, did you seek proposals from anyone else to buy
25 the estate's interest in the property?

Page 19

1      A.  I didn't run an ad seeking, or anything like
2  that, seeking proposals from others.  I had to notice the
3  transaction, as I do any transfer in bankruptcy, and if
4  there were others who received that notice that wanted to
5  object to it through offering to pay more money, they
6  certainly could have done it, but I didn't receive any
7  objection to the proposal.
8      Q.  Short of a formal objection, did you receive any
9  inquiries from anyone else informally?
10     A.  I don't recall any.  There's a possibility I
11 could have spoken to Steve Grennell, who represents
12 Chrysler, but I just don't recall any.
13     Q.  Did you ever say --
14     A.  You know, I could have talked to, and back to
15 your question, I might have talked to the U.S. Trustee's
16 Office about the transaction.
17     Q.  If you did, who would you have spoken with
18 there?
19     A.  It would have been Bob Raschke, who is the
20 Assistant U.S. Trustee, or Mike Fadlovich, who is an
21 attorney in the U.S. Trustee's Office.
22     Q.  And what would the purpose of that discussion
23 have been?
24     A.  If this possible conversation happened, I would
25 have just called to explain why I was doing what I was

Page 20

1  doing.
2      Q.  Okay.  And I mean I understand you serve as
3  trustee in many cases, correct?
4      A.  I do.
5      Q.  And it wouldn't be, although you don't do it in
6  every case, it wouldn't be unusual for you to contact one
7  of the trustees or their counsel just to let them know
8  what you were doing and find out if there was some
9  objection out of that office?
10     A.  Not unusual.
11     Q.  Okay.  And whether you did that or not in this
12 case, you didn't receive any objection from the trustee's
13 office?
14     A.  I did not.
15     Q.  You had indicated that you had checked the
16 county records for the assessed value of the property at
17 some point?
18     A.  I indicated I probably had.  I think that's what
19 I said.
20     Q.  And, again, that would be a, even if you don't
21 have a specific recollection of doing it in this case,
22 that wouldn't be, that would be a fairly standard
23 procedure for you?
24     A.  It would.
25     Q.  Okay.  Did you ever order an appraisal of the

Page 21

1  property?
2  A.  I did not.
3  Q.  And did you ever obtain an old appraisal that
4  might have been done either by the, on behalf of the
5  debtor or one of the debtor's lenders?
6  A.  You know, it's certainly possible that there
7  could be one somewhere in all of the documents that have
8  come under my control in this case, but I don't recall
9  looking at one and relying on any such appraisal.
10  Q.  All right.  And, again, that would have been,
11  you wouldn't have been too focused on the value of the
12  property because it was so clearly underwater, correct?
13  A.  I had concluded that there wasn't equity there
14  for the estate.
15  Q.  Now, again, as the U.S. Bank foreclosure
16  proceeded, you said you didn't do anything to monitor
17  what was going on with that, correct?
18  A.  I did not monitor it.
19  Q.  And as far as you knew, neither the debtor nor
20  the estate maintained any interest in the property which
21  could be used, which would be the basis for a U.S.
22  trustee to redeem the property from the U.S. Bank
23  foreclosure, correct?
24  A.  You know, I don't remember the timing of all of
25  these things.  I don't remember when the stay of relief

Page 22

1  motion was brought, you might have indicated earlier, but
2  I just don't remember when that was.  If that was before
3  I had signed the deed to Mr. Thomas it would have had
4  some redemption rights then, but I just don't remember
5  the timing of those things, Mr. Lockhart.
6  Q.  But subsequent to the transaction where you
7  executed the deed and delivered it, you didn't take any
8  action to redeem the property?
9  A.  That's true.
10  Q.  Okay.  And did you engage in any negotiations
11  with U.S. Bank about purchasing U.S. Bank's
12  certificate --
13  A.  No.
14  Q.  -- of sale?  Did you ever consider doing that?
15  A.  No.
16  Q.  Did you consider what would happen, or what's
17  your understanding of what would happen if no one
18  redeemed from U.S. Bank's foreclosure sale?
19  MR. BURTON:  Object to calling for
20  speculation and legal conclusion.  You can answer.
21  THE WITNESS:  If no one at all had
22  redeemed, I would -- I'm no mortgage expert -- but I
23  would assume U.S. Bank would own the property.
24  Q.  (By Mr. Lockhart)  And would own the -- U.S.
25  Bank, its debt was roughly a quarter of a million

Page 23

1  dollars?
2  A.  It was 200 to 250.  It was in that range, yeah.
3  Q.  And there was, if that was the only debt against
4  the property, there would have been equity there,
5  correct?
6  A.  Yes.
7  Q.  So U.S. Bank, if events had unfolded in that
8  fashion, there would have been no redemption and U.S.
9  Bank would have realized a substantial windfall, correct?
10  A.  It appears that way to me.
11  MR. BURTON:  You know --
12  Q.  (By Mr. Lockhart) Did you consider taking any
13  action against U.S. Bank?  If that had occurred, would
14  you have taken some action against U.S. Bank to prevent
15  U.S. Bank from realizing such a windfall?
16  MR. BURTON:  I'm going to object.
17  THE WITNESS:  That never occurred.
18  MR. BURTON:  I'm going to object as
19  speculation and calling for legal conclusion.
20  MR. LOCKHART:  Okay.  I just want an
21  objection.
22  MR. BURTON:  Yeah, but my understanding --
23  MR. LOCKHART:  I don't want a speaking one.
24  MR. BURTON:  But my understanding is that,
25  of mortgage foreclosures, is that if U.S. Bank had been

Page 24

1  paid, the money doesn't go to them.
2  MR. LOCKHART:  Matt, that's inappropriate,
3  okay, what your understanding is from a legal
4  perspective.  I'm asking questions of the witness.
5  THE WITNESS:  Just go back to your
6  question.
7  Q.  (By Mr. Lockhart)  Okay.
8  A.  Your question was?
9  Q.  Well, I think I asked that --
10  MR. LOCKHART:  Why don't you read back the
11  question and the answer?  I think we got an answer to it
12  and we can probably move on.
13  (Record read as follows:  "Did you consider
14  taking any action against U.S. Bank?  If that had
15  occurred, would you have taken some action against U.S.
16  Bank to prevent U.S. Bank from realizing such a windfall?
17  "ANSWER:  That never occurred."
18  THE WITNESS:  Let me say, just so it's
19  clear, when I say that never occurred, what I meant was
20  the events you were asking me to speculate about never
21  occurred so I never had to engage in any analysis as to
22  whether there was anything I could do.
23  Q.  (By Mr. Lockhart)  Well, do you believe that you
24  would have had a claim against U.S. Bank in that context?
25  A.  I haven't, as I've said, I haven't done any

Page 25

1  analysis, but I think the bankruptcy code has a section
2  that talks about mortgage foreclosures conducted in the
3  regular course of business, although that might just
4  apply -- I don't know.
5      Q.  Okay.
6      A.  I would have looked at the code and determined
7  whether there was any claim or not.
8      Q.  Just so the record is clear, you never
9  investigated taking such a potential action?
10     A.  That's true.
11     Q.  Okay.
12         MR. BURTON:  Could I have one second?
13         MR. LOCKHART:  Yeah.
14         (Discussion held off the record.)
15     Q.  (By Mr. Lockhart)  At what point in time did you
16  learn that GMAC had not filed a notice of intent to
17  redeem or taken any action to redeem from the U.S. Bank
18  foreclosure?
19     A.  It would have been in mid July.
20     Q.  And how did you come to learn that?
21     A.  I received a call from an attorney, Troy Van
22  Beek, in mid July.
23     Q.  And up until that point, as I believe you
24  indicated previously, you hadn't done anything to
25  investigate what was going on with the foreclosure

Page 26

1  process and any redemptions?
2      A.  I was not monitoring that foreclosure.
3      Q.  So up until mid July you hadn't pulled a
4  certificate of title or done anything of the sort?
5      A.  I had not looked at a certificate of title until
6  after I spoke with Mr. Van Beek.
7      Q.  Okay.  And when you say you heard from Mr. Van
8  Beek in mid July, can you specify a date?
9      A.  I think -- I can't give you a specific date.  I
10  think it was about the 15th of July.  It was in that
11  range.
12     Q.  And how do you determine that?
13     A.  Well, I have a telephone message from him
14  that's, at least it shows that it was the 21st of July
15  that he left that message.  I think, I would have to
16  check to make sure, but I think I had a trustee calendar
17  on the 21st, and I talked to him the week before,
18  whenever he sent me that, or left me that voicemail,
19  which I think it was the 21st.  I think I talked to him
20  the week before that, so that's how I'm getting to that
21  date.
22     Q.  You produced to us this morning some handwritten
23  notes that appear to reflect a phone call from a Troy
24  regarding Northridge.  Would these notes be the notes
25  from that initial conversation?

Page 27

1      A.  Well, I'm not, I'm not sure.  I think --
2      Q.  If you want to look at them --
3      A.  Yes.
4      Q.  -- that's fine with me.
5          MR. BURTON:  We should just mark them.
6          (Seaver Exhibit 1 marked.)
7      Q.  (By Mr. Lockhart)  I have Seaver 1 here, and
8  then there's a second page to this.  The second page --
9      A.  The second page says, kind of says "Denny
10  Hecker" up at the top and then it has a Northridge
11  address, and then it says, "Can Denny pay debts" under
12  it.  This one might have been my first conversation with
13  Mr. Van Beek.  I'm saying might have, because, as you can
14  see, I didn't date these things.
15     Q.  Okay.
16     A.  And I think this other page might be a second
17  conversation that I had with Mr. Van Beek.
18     Q.  All right.  So the order of those notes, I mean
19  you weren't taking those consecutively on a pad; they are
20  probably independent pieces of paper?
21     A.  They are two separate sheets of yellow paper
22  sitting in my file.
23     Q.  Okay, fair enough.  Tell us what you recall
24  about that initial conversation with Troy Van Beek.
25     A.  And, again, I think it was the initial

Page 28

1  conversation.  One of the things he wondered about was
2  whether Denny Hecker could pay debts that Denny Hecker
3  owed post-petition.  Mr. Van Beek indicated to me that
4  Mr. Hecker -- well, he indicated to me that they were
5  engaged in some sort of redemption process with
6  Northridge and there was an 800-some-dollar judgment that
7  had been purchased by Palladium, and he indicated to me
8  that Mr. Hecker, he thought Mr. Hecker was trying to pay
9  off that judgment.  He wondered if legally Mr. Hecker
10  could pay a judgment off post-petition, and I told him
11  that I thought as long as it wasn't bankruptcy estate
12  money he was using, I didn't think there was anything
13  that would preclude Mr. Hecker from paying off that
14  post-petition.  And it would have been in that first
15  conversation, too, Mr. Lockhart, that I would have
16  learned GMAC had not redeemed.  Because while I don't
17  remember the specifics of the conversation, I know that I
18  would have been curious as to why they would be redeeming
19  if they thought there was value beyond GMAC, and so it
20  would have been in that conversation that I would have
21  learned that GMAC -- I think I'm remembering that's GMAC
22  that had the second and third -- I think I learned in
23  that conversation that they had not redeemed.
24     Q.  And at that point in time did you then
25  understand, because of the discussion about Palladium,

Page 29

1  that somehow there were discussions about Palladium
2  redeeming or someone redeeming through Palladium?
3      A.  I did.  I understood that Palladium was going to
4  redeem, and it wasn't clear to me, I think, whether it
5  was just through that $800 judgment or through the New
6  Buffalo judgment, too, because Mr. Van Beek mentioned
7  both of those things.
8      Q.  And did you have an understanding then as to
9  when this redemption would be occurring, what the time
10 frame was?
11     A.  He may have told me what their time frame was in
12 that conversation.  I don't recall whether he did or not.
13 I knew it was happening fast, but I didn't know the exact
14 times.
15     Q.  Well, you had enough of an understanding of the
16 redemption process under Minnesota law to know that
17 there's a short time frame to accomplish these things?
18     A.  I did know that.
19     Q.  And did you do anything in response to this
20 inquiry you got from Mr. Van Beek?
21     A.  After the first conversation I asked him to keep
22 me up to date on what was happening.
23     Q.  Did you express any concern to Mr. Van Beek
24 about the propriety of what Palladium was doing?
25     A.  What I recall is that -- I don't recall if it

Page 30

1  was the first conversation or the second conversation.
2  Mr. Van Beek, I think he asked if I was going to do
3  anything to stop the redemption, it was something like
4  that, those probably weren't his exact words, and I
5  indicated that I wasn't.  But that my job, one of my jobs
6  as trustee was to collect money for the estate from
7  whatever sources I could, and I would certainly continue
8  to do that.
9      Q.  Well, did you say anything more specific than
10 that?
11     A.  I don't recall that I did.  He asked me, I also
12 said, there was something about the automatic stay, too,
13 and I don't remember exactly how it came up, but I told
14 him -- well, it came up when he said was I going to do
15 anything to stop the redemption, it was in that context,
16 and I said I would not assert that the automatic stay
17 precluded them from going forward.
18     Q.  Okay.
19     A.  There would have been some discussion, too,
20 Mr. Lockhart, about -- and this would have been the
21 second conversation for sure, not the first -- I think he
22 was talking to me about that $860 judgment, whatever the
23 exact amount, the little judgment.
24     Q.  The Koch judgment --
25     A.  Yeah.

Page 31

1      Q.  K-O-C-H, I believe.
2      A.  Yeah, the one that he then told me in the
3  voicemail was paid off, and then at some point he told me
4  they were going to redeem, even though the money had been
5  paid, they were -- "they" being Palladium -- they were
6  going to attempt, or going to redeem off that judgment as
7  well.  And I said, well, how can you do that if the
8  judgment is satisfied?  And he indicated to me that he
9  had a theory that even if the judgment was satisfied they
10 still had redemption rights.  So we would have had some
11 discussion about that.
12     Q.  But that was a subsequent conversation?
13     A.  I believe it was, yeah.
14     Q.  Before moving on to that conversation, or any
15 others, have you exhausted your recollection of the first
16 conversation?
17     A.  The first one?  Mr. Lockhart, some of what I've
18 said about the discussion about the automatic stay and
19 not, me not stopping the redemption, that could have
20 happened in the second conversation.
21     Q.  Okay.  And that's fine, I'm just trying to get a
22 little bit of a chronology here.
23     A.  Sure.
24     Q.  How many conversations did you have with Mr. Van
25 Beek?

Page 32

1      A.  I can remember for sure two conversations, there
2  could have been more.  There could have been three or
3  four.  And there could have been more voicemails than
4  this, too, where he would have, they wouldn't have been
5  long, he would have said something like -- well, that's
6  what I remember about the conversations.
7      Q.  Okay.
8          (Break taken from 10:07 to 10:17 a.m.)
9  BY MR. LOCKHART:
10     Q.  Back to the conversations with Troy Van Beek.
11 You remember two for sure, it might have been three or
12 four, but have we covered everything that you can recall
13 from those conversations?  And the witness is now looking
14 at Exhibit 1.
15     A.  Yeah, I'm looking at Exhibit 1.  That's my
16 handwriting on Exhibit 1.  He, Troy had told me, I think
17 in probably the second conversation, that he thought that
18 Ralph Thomas and/or Denny Hecker, working with Ralph
19 Thomas, were trying to get control or ownership of
20 Northridge.  I think he thought that Denny or Ralph
21 Thomas, or their attorney, I'm not sure who had gone to
22 U.S. Bank and tried to get an assignment of the sheriff's
23 certificate, and I think he was also concerned, and you
24 can see it in that voicemail transcript, concerned that
25 perhaps someone was going to try to pay off the New

Page 33

1  Buffalo judgment. So I remember him talking about those
2  things. Yeah, generally I think I've covered the areas
3  that we've talked about.
4      Q.  And you also produced to us this morning a
5  transcript of a voicemail message you received from
6  Mr. Van Beek, and apparently your records reflect that
7  this was received on July 21st of 2010 --
8      A.  Yes.
9      Q.  -- is that right?
10     A.  Yes.
11     Q.  And did you have another conversation with
12 Mr. Van Beek after he left that voicemail message?
13     A.  See, I think I may have actually spoken with him
14 on the 21st as well. I'm not positive, but I think I may
15 have.
16     Q.  So after he left that message you called him
17 back?
18     A.  I don't remember the sequence. If I remember
19 correctly, I may have had a trustee calendar that day,
20 which would have meant I was over at the federal
21 courthouse not taking calls, but I, I think I at least
22 tried to call him that day. Whether I actually spoke
23 with him that day, I think I might have, but I'm just not
24 positive, as you can tell.
25     Q.  Okay. And did you then have any, did you have

Page 34

1  any conversations with Mr. Van Beek after New Buffalo had
2  redeemed from U.S. Bank's foreclosure?
3      A.  I'm not sure on the dates. My best, I'm kind of
4  guessing, I don't think that I had a conversation with
5  him after I had filed a notice of commencement of
6  bankruptcy case against, on a certificate of title
7  arising under 549 of the code. I think I might have
8  placed a call to him after that and then got a call back
9  from an attorney, Mr. Westrick, I think, is his name. I
10 can't recall that I spoke with Mr. Van Beek after the
11 time frame I'm giving to you.
12     Q.  Did you speak with Mr. Westrick?
13     A.  I did.
14     Q.  And what was the subject of that conversation?
15     A.  The redemption, and you know, the redemption,
16 and by then I had reached the conclusion that there was a
17 transfer here that was, at least one transfer, and
18 probably more, that were avoidable by me as a trustee.
19     Q.  And when did you reach that conclusion?
20     A.  Well, it certainly would have been before I
21 filed a, or had Mr. Burton file the complaint, which I
22 think it was the 26th of July, so sometime after, you
23 know, Mr. Van Beek initially contacted me, and then
24 sometime before that complaint got filed. It was a
25 pretty short time frame there.

Page 35

1      Q.  And there was a weekend there as well, I think,
2  correct?
3      A.  There was.
4      Q.  What information did you receive, subsequent to
5  the redemption and before commencing the lawsuit, that
6  led you to conclude that there was, that one or more
7  avoidable transfers had occurred?
8      A.  Well, I had the, I got a -- I don't remember
9  when I got the Certificate of Title, the first
10 Certificate of Title copy, they have fax headers on them,
11 they came from the, they came from Hennepin County. I'm
12 sorry, would you ask me the question again?
13     Q.  The question is what information did you receive
14 after the redemption had occurred, so on or after
15 July 22nd of 2010 and before July 26th of 2010, when your
16 counsel commenced this lawsuit, that led you to conclude
17 that one or more avoidable transfers had occurred?
18     A.  All right. I would have, I would have looked, I
19 believe, if I -- could I look at that Certificate of
20 Title to see what the fax is on it?
21     Q.  Well, you've delivered two of these this
22 morning.
23     A.  Yep.
24     Q.  One with a fax heading of July 23, 2010, and one
25 with a heading of August 4, 2010.

Page 36

1      A.  Okay. So I would have looked at the July 23 one
2  for sure, but I would have also been in, as an attorney,
3  I would have done legal research on the issues of
4  avoidability here, and the, and when title passes in a
5  torrens property. I can't give you an exact date on
6  those things. I mean it was an ongoing process. From
7  the first time Mr. Van Beek contacted me, I started
8  thinking about it, and looking at issues involved.
9      Q.  From the time of his first contact in mid July?
10     A.  Mid July I would have been thinking about it,
11 yes.
12     Q.  Yet in one of your conversations you indicated
13 that you weren't intending to do anything to interfere
14 with the redemption, correct?
15     A.  That's the truth. And I didn't do anything to
16 interfere with the redemption.
17     Q.  Well, in this proceeding you're seeking to avoid
18 that redemption.
19     A.  I'm asserting my lien avoidance and transfer
20 avoidance rights. Obviously they were redeemed, I didn't
21 do anything to stop the redemption, which is what he had
22 asked me about.
23     Q.  Well, and you didn't tell him at that time that
24 you intended to seek to avoid --
25     A.  I told him that as a --

Page 37

1    Q.   -- the transfer?
2    A.   Oh, I'm sorry.  I told him that as a trustee I
3  would pursue the collection of money in this case as I
4  always had.  I did not ever tell him that I would not
5  bring a transfer avoidance claim against his client.
6    Q.   When you spoke in terms of pursuing collection
7  in this case, you didn't tell him that, you didn't talk
8  in terms of an avoidance proceeding, did you?
9    A.   Would you ask me that question again?  I don't
10 understand.
11   Q.   Your statement that, your general statement that
12 you would pursue collection efforts in your, continue to
13 pursue collection efforts as trustee in this case, you
14 didn't speak in terms of an avoidance proceeding with
15 respect to the proposed or intended redemption by New
16 Buffalo, correct?
17   A.   I did not tell Mr. Van Beek that I was going to
18 be bringing a transfer avoidance action against
19 Palladium.
20   Q.   And when you talk in terms of collection
21 efforts, you're engaged in all kinds of collection
22 efforts in connection with this Hecker bankruptcy
23 proceeding, correct?
24   A.   That's true.
25   Q.   And those include collection efforts against

Page 38

1  Christi Rowan and all kinds of individuals, correct?
2    A.   They include various claims, both under my
3  avoidance powers and other rights that I have as trustee.
4    Q.   In some interrogatory answers you made reference
5  to a $900,000 anonymous offer that was made to buy
6  Northridge.  I guess can you give us more information
7  about that, too?  Who, what, where, when?
8    A.   Here's what I know about it.  An attorney named
9  John Lamey, L-A-M-E-Y, sent me an email.  Mr. Lamey is a
10 consumer bankruptcy attorney.  He sent me an email saying
11 he had a client who was interested in purchasing
12 Northridge for -- I'm not looking at the email now of
13 course -- but I sent it on to Mr. Burton and said, let
14 these people, your clients, I think it was before your
15 involvement, know about this.  So that's what I know
16 about it.  I haven't asked Mr. Lamey who the person is.
17   Q.   And did you receive any further communications
18 from Mr. Lamey or anyone else about that proposal?
19   A.   Mr. Lamey may have asked me about it at some
20 point and just said is anything happening?  He may have.
21 I don't remember if he did or not.  If that happened, I
22 would have just told him that I passed on the
23 information.
24   Q.   And when did you receive that communication with
25 Mr. Lamey, or from Mr. Lamey?

Page 39

1    A.   Oh, it was within the last few months, I'm sure,
2  but I can't be any more specific than that.  It was after
3  the redemption for sure, if that's the time, if you're
4  trying to put a context on it that way.
5    Q.   And I had spoken earlier about when you learned
6  that GMAC hadn't redeemed.  I assume that you learned or
7  concluded within the same time frame that the IRS had not
8  or wasn't going to redeem based on its lien interest as
9  well?
10   A.   Yeah.  I would have, I don't remember if Mr. Van
11 Beek told me that or not, about the IRS.  I don't recall
12 him mentioning the IRS in our conversations.  But I
13 certainly would have, when I got the Certificate of
14 Title, the first one, I would have seen that there was no
15 notice of intent to redeem.
16   Q.   When you say "the first one," you're referring
17 to this July 23, 2010?
18   A.   I am, yeah.
19   Q.   Okay.
20        MR. LOCKHART:  Since we've been referring
21 to it, why don't we mark that as an Exhibit 2.
22        (Seaver Exhibit 2 marked.)
23   Q.   (By Mr. Lockhart)  And just for the record, is
24 Exhibit 2 that Certificate of Title that you or someone
25 acting on your behalf obtained from Hennepin County on

Page 40

1  July 23, 2010?
2    A.   It is.  And I'm getting the July 23 date, of
3  course, from the fax header up on top.
4    Q.   And at least up until the time that you learned
5  that GMAC and the IRS had not exercised any redemption
6  rights, you continued to believe that there was no value
7  in the Northridge property, correct?
8    A.   That's true.
9    Q.   And up through July 22, 2010, you had not taken
10 any action in your capacity as trustee to assert any
11 continuing ownership interest in Northridge, correct?
12   A.   That's true.
13   Q.   And do I understand correctly that at some point
14 after you had raised the issue and written the letter to
15 Judge Kressel regarding the concern surrounding the
16 disposition of the Northridge property, the transfer to
17 Mr. Thomas, that Mr. Thomas' counsel had offered to
18 return the deed to you?
19   A.   What's the question again?
20   Q.   The question is isn't it correct that at some
21 time after March of 2010, and before July 22 of 2010, you
22 learned that Mr. Thomas had offered to deliver the deed
23 to the property that you had provided to Mr. Thomas, he
24 had offered to return that to you?
25   A.   You know, I'm not positive.  It could well be.

Page 41

1   I just don't remember, Mr. Lockhart.
2       Q.  Okay.  If that occurred, you didn't take any
3   action to obtain it?
4       A.  If it occurred, I didn't.  Yes, you're right.
5           (Seaver Exhibit 3 marked.)
6       Q.  Showing you what's been marked as Seaver 3, it
7   apparently is an email sent by Mark Jacobson of the
8   Leonard Street firm to Mr. Burton, Subject:  Ralph
9   Thomas, dated November 10, 2010.  Have you seen this
10  before?
11      A.  I have seen this before.
12      Q.  Okay.  And it, I guess, to summarize, purports
13  to lay out facts and circumstances concerning the
14  transfer of the property from you as trustee of the
15  estate to Mr. Thomas and subsequent communications about
16  that transaction, and I guess my question would be is
17  this recitation of events consistent with your
18  understanding.
19          MR. BURTON:  You're talking about the
20  entire, the whole email or just that portion of it?
21          MR. LOCKHART:  Well, I'm asking generally
22  about the whole thing, and then I may focus on a couple
23  of specifics.
24          THE WITNESS:  (Examining document.)  Of
25  course, many of these things talk about what Mr. Thomas

Page 42

1   knew or didn't know, and I don't know what Mr. Thomas
2   knew or didn't know, so if there's some specific things?
3       Q.  (By Mr. Lockhart)  Well, if you turn to the
4   second page?
5       A.  Yeah.
6       Q.  And focus on the last four --
7       A.  Bullets?
8       Q.  -- bullet points?
9       A.  Yeah, okay.
10      Q.  The first of those is that Mr. Thomas' counsel
11  contacted you or your counsel to ask for instructions
12  about what to do with the Northridge property.
13      A.  I'm sure that he didn't contact me personally.
14  I don't recall that happening, and I don't think it would
15  have.  I think that he, I mean I guess you would have to
16  ask Mr. Burton.  I think they did contact Mr. Burton at
17  some point, but I'm not positive.
18      Q.  And that would have been before the, before
19  July 22, 2010, correct?
20      A.  Yes, if it happened, it would have been before
21  that.
22      Q.  And you don't have any reason to dispute
23  Mr. Jacobson's contention that that happened?
24      A.  Like I'm saying, you would have to ask
25  Mr. Burton.  I think that it did though.

Page 43

1       Q.  And, Mr. Seaver, I mean I understand he's acting
2   as your representative.
3       A.  Yep.
4       Q.  He's your counsel in this case, I don't get to
5   take his deposition, so this is my shot to determine
6   whether we've got any disagreement about the facts as
7   related in this email, you know, unless you're intending
8   to put Mr. Burton forward as a witness in this case, in
9   which case we've got other problems.
10      A.  Well, why don't we take a minute here and let me
11  talk with Mr. Burton about this, and maybe I can clarify
12  all this for you.
13      Q.  Well, are you telling me that without talking to
14  Mr. Burton you're not going to be able to respond about
15  any of these four bullet points without any level of
16  certainty?
17      A.  Well, what I'm telling you is that on this first
18  one, if I talk with Mr. Burton I can confirm whether or
19  not that contact took place.  I've told you what I think
20  already.
21      Q.  All right.  Well, before we do that, let me ask
22  a few more questions about these other bullets and then
23  I'll give you that opportunity, okay?  Is that fair?
24      A.  That's fine.
25      Q.  Okay.  The second bullet point relates

Page 44

1   Mr. Jacobson's understanding of some communications with
2   your counsel that includes the statement that "it was the
3   trustee's conclusion that he had disposed of the
4   Northridge property."  Without reference to the
5   statements that you were not, or the conversations that
6   you were not a party to, is that an accurate statement
7   regarding your conclusion as trustee regarding
8   Northridge?
9       A.  Let me answer it this way, and I think it will
10  get you the information you need.  I'm not going to tell
11  you what my conversations were with Mr. Burton, of
12  course.
13      Q.  No, I'm asking for your state of mind.
14      A.  This second bullet point, this is before
15  July 15, I'm just picking that as the date that I think
16  Mr. Van Beek -- or just say before July 1, we can back it
17  up even further.  Before July 1, I would have, it would
18  have been my conclusion that I had disposed of the
19  Northridge property and I had no further interest in the
20  property as trustee.
21      Q.  Okay.  So that's an accurate statement --
22      A.  Yes.
23      Q.  -- as of --
24      A.  We just picked July 1st.  Yes.
25      Q.  Okay.  And it would also be true then, going

Page 45

1   down to the next bullet point, that you didn't have any
2   interest as of July 1, again picking a date out of the
3   air, July 1 of 2010, you didn't have any interest in
4   having the deed returned by Mr. Thomas?
5       A.   That's true.
6       Q.   And even as of November 10, 2010, that would be
7   the last bullet point, Mr. Thomas or his counsel were
8   still in possession of that deed, correct?
9       A.   Well, he's saying it in this bullet point,
10  whatever -- I'm sorry, what was your question again?
11      Q.   My question is:  As of the time of the writing
12  of this email, which is November 10, 2010, is it true
13  that Mr. Thomas or his lawyer still had possession of the
14  original trustee's statement?
15      A.   I have no reason to doubt that.
16      Q.   All right.  Why don't we go off the record and
17  you can ask Mr. Burton about that.
18           (Break taken from 10:45 to 10:58 a.m.)
19  BY MR. LOCKHART:
20      Q.   All right.  Back to this question about that
21  first bullet point on the second page that we were
22  talking about.  Are you able to tell me anything more
23  about that purported conversation?
24      A.   I can't tell you anything more about it.
25      Q.   Okay.  I understand that sometime recently, and

Page 46

1   I guess it would have been subsequent to November 10th of
2   2010, you've received a quitclaim deed from Mr. Thomas,
3   do I understand that correctly?
4       A.   Both a quitclaim deed and that original deed
5   that I had signed.
6       Q.   And when were those delivered?
7       A.   I mean I have it in my file, and I thought we --
8   have we given you this information?
9       Q.   I recall learning about it.  I don't know if we
10  have copies of it.
11           MS. VEHRS:  I think we do.
12           MR. LOCKHART:  Okay, fair enough.
13      Q.   (By Mr. Lockhart)  Then I won't --
14      A.   Whatever the date is, it would have been shortly
15  after that cover letter.
16      Q.   And was there any kind of a settlement agreement
17  attendant to that?
18      A.   There's no settlement.  If there's a settlement
19  I would have noticed it.  There isn't.  There is, as I
20  recall, there was some communication between Mr. Burton
21  and Mr. Thomas' attorney, essentially -- well, you can
22  look at the communication and see what it says.  But as I
23  recall, essentially he was just giving those back and
24  wanted nothing further to do with Northridge is what it
25  boils down to.

Page 47

1       Q.   Was there any, were there any other terms or
2   consideration exchanged?
3       A.   You know, there certainly is no financial
4   consideration.  I think that we probably -- I can't
5   recall what was in the communication.  There was
6   certainly no financial consideration.  He's not getting
7   paid anything.
8       Q.   Did he execute a -- did you, as trustee, give
9   Mr. Thomas any kind of a release --
10      A.   No.
11      Q.   -- as to any liability he might have?
12      A.   No.  Again, I couldn't do that without court
13  authorization.
14      Q.   That makes sense.  And this communication, has
15  that been produced to us as well that you're referring
16  to?
17      A.   I don't know.  It wouldn't be -- if we haven't
18  given it to you, I'll ask Mr. Burton to send it over to
19  you.
20           MR. BURTON:  My belief is we've produced
21  all that correspondence.  If we haven't, we can certainly
22  do that.
23           MR. LOCKHART:  It would have been some
24  correspondence subsequent to this November 10.
25           MR. BURTON:  There's probably a series of

Page 48

1   about two or three emails.
2           MR. LOCKHART:  Okay, we'll follow up and
3   look at what we've got, and maybe you can take a look at
4   what you've got, and you and Karla can exchange notes on
5   that.
6           MR. BURTON:  Fair enough.  And I can tell
7   you I don't think there was any additional consideration.
8   I think it was just a request.
9           MR. LOCKHART:  Okay.  Fair enough.  That's
10  all I have, Mr. Seaver.  Thank you for your time.
11           THE WITNESS:  Thank you.
12           MR. BURTON:  I have no questions.  Do you
13  want to review the transcript, Mr. Seaver?
14           THE WITNESS:  Yeah.
15           (Proceedings concluded at 11:02 a.m.)
16
17
18
19
20
21
22
23
24
25

1                    REPORTER'S CERTIFICATE

2  STATE OF MINNESOTA )
                       ) ss.
3  COUNTY OF CARVER    )

4

5       I hereby certify that I reported the deposition of
   RANDALL L. SEAVER on the 21st day of December, 2010, in
6  Minneapolis, Minnesota, and that the witness was by me
   first duly sworn to tell the truth;
7

8       That the testimony was transcribed by me and is a
   true record of the testimony of the witness;
9

10      That the cost of the original has been charged to
   the party who noticed the deposition, and that all
11 parties who ordered copies have been charged at the same
   rate for such copies;
12

13      That I am not a relative or employee or attorney or
   counsel of any of the parties, or a relative or employee
14 of such attorney or counsel;

15      That I am not financially interested in the action
   and have no contract with the parties, attorneys, or
16 persons with an interest in the action that affects or
   has a substantial tendency to affect my impartiality;
17

18      That the right to read and sign the deposition by
   the witness was reserved;
19

20      WITNESS MY HAND AND SEAL THIS 21st day of December

21 2010.

22

23      -------------------------------------

24      Elizabeth J. Gangl
        Notary Public, Carver County, Minnesota
25      My commission expires 01/31/2015

In re:                                              Bky. File No. 09-50779-RJK

Dennis E. Hecker

        Debtor.

---

Randall L. Seaver, Trustee,                         Adv. File No. 10-5027-RJK

        Plaintiff,

vs.

New Buffalo Auto Sales, LLC, f/k/a Buffalo
Chrysler, LLC, Maurice J. Wagener, and Palladium
Holdings, LLC,

        Defendants.

---

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2010, I caused the following documents:

1.   Notice of Hearing and Motion for Summary Judgment;
2.   Memorandum in Support of Motion for Summary Judgment of Defendants New
     Buffalo Auto Sales, LLC and Palladium Holdings, LLC;
3.   Affidavit of Karla M. Vehrs; and
4.   Proposed Order Granting Motion for Summary Judgment

to be filed electronically with the Clerk of Court through ECF and that the above documents will
be delivered by automatic e-mail notification pursuant to ECF and this constitutes services or
notice pursuant to Local Rule 9006-1(a)

Dated: December 22, 2010                    /e/ Erin Daniels
                                            _____
                                            Erin Daniels
                                            Lindquist & Vennum PLLP
                                            80 South 8th Street
                                            Suite 4200
                                            Minneapolis, MN  55402
                                            (612) 371-3211

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Dennis E. Hecker

        Debtor.

| | |
|---|---|
| Randall L. Seaver, Trustee,<br><br>       Plaintiff,<br><br>vs.<br><br>New Buffalo Auto Sales, LLC, f/k/a Buffalo Chrysler, LLC, Maurice J. Wagener, and Palladium Holdings, LLC,<br><br>       Defendants. | Adv. File No. 10-5027-RJK<br>Bky. File No. 09-50779-RJK<br><br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

This case came before the court on January 19, 2011 on the motion of defendants New Buffalo Auto Sales, LLC and Palladium Holdings, LLC for summary judgment. Based upon the files and records,

IT IS HEREBY ORDERED that New Buffalo Auto Sales and Palladium's motion is granted in its entirety. The trustee's claims against all defendants in this adversary proceeding are dismissed with prejudice.

Dated: _____

                                       _____

                                       Robert J. Kressel<br>                                       United States Bankruptcy Judge